IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER CULVERHOUSE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:21-cv-121-RAH-SMD |
| | ) [WO] |
| SOUTHERN UNION STATE | ) |
| COMMUNITY COLLEGE, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Christopher Culverhouse suffers from cerebral palsy and Charcot-Marie-Tooth ("CMT") disorder, conditions that severely limit his motor skills. In 2019, Culverhouse, along with thirty-one other individuals, applied for a history professor position at Southern Union State Community College. After placing fifth in a competitive presentation and interview process for the position, Culverhouse filed this suit for disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 701 (Rehabilitation Act). Before the Court is Southern Union's Motion for Summary Judgment. For the following reasons, Southern Union's motion is due to be granted.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The legal elements of a claim determine which facts are material and which are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is not material if a dispute over that fact would not affect the outcome of the case under the governing law. *Id*.

A court must view the proffered evidence in the light most favorable to the nonmovant and resolve all reasonable doubts about the facts in the nonmovant's favor. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1242–43 (11th Cir. 2001). The nonmovant must produce sufficient evidence to enable a jury to rule in his favor; a mere scintilla of evidence in support of a position is insufficient. *Id.* at 1243. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *City of Delray Beach v. Agric. Ins. Co.*, 85 F.3d 1527, 1530 (11th Cir. 1996)).

## BACKGROUND

Culverhouse suffers from cerebral palsy and Charcot-Marie-Tooth disorder, a form of muscular dystrophy. According to Culverhouse, his symptoms include pain,

fatigue, and shaking, which generally impact his balance and his ability to walk and take stairs. Culverhouse also claims that his condition is noticeable to anyone due to his mannerisms and gait.

Since August 2008, Culverhouse has served as an adjunct professor Southern Union, teaching classes in history and ethics. According to Culverhouse, numerous staff at Southern Union were aware of his condition because they could easily see it and he has told them about it.

On March 4, 2019, Southern Union posted a job announcement for a full-time history professor position. A three-member selection committee was created to conduct interviews of those who met the minimum qualifications for the position. The committee consisted of Clint Foster (committee chair), Darlene Andrews, and Debra Cook.

According to Culverhouse, Foster, Cook, and Andrews were aware of his condition because they could observe him and because, in the case of Foster and Cook, they had taught him in classes before. Foster was a teacher at Culverhouse's high school. In 1999, Culverhouse had informed Foster about his medical condition. Culverhouse also recalled Foster making a statement in the 1990's when he took Culverhouse home from a high school football game that "I ought to leave your crippled ass here. Just sit here and keep your mouth shut on the way home." (Doc. 34-4 at 11.) Similarly, Cook was a college professor and taught Culverhouse in a

math class in 2001. Culverhouse maintains he told Cook then that he suffered from a disability.

In response to the posting, Southern Union received thirty-two applications, including one from Culverhouse. Fifteen applicants met the minimum qualifications and were scheduled for interviews. Only thirteen interviewed, however.

For each interview session, an applicant presented a writing sample, performed a teaching presentation, and then participated in an interview with the committee. The committee considered the presentation as the most important consideration, giving it more weight than the others. These considerations were reduced to a scoring system that was more heavily weighted towards the teaching presentation (50%), with lesser weights for the interview (30%) and the writing sample (20%). (*See, e.g.,* Doc. 31-2 at 61–67.) The committee did not consider any applicant's work experience, teaching experience, or any other minimum qualifications.

For the teaching presentation, the applicants were scored on their organization, content, delivery, use of media/whiteboard, creativity, and time frame. (*See, e.g.*, Doc. 31-2 at 65.) As stated by Foster, Foster considered whether there was "a clear introduction," whether the presentation was more or less organized, and the way the individual presented. (Doc. 31-11 at 25.) Cook similarly testified that in demonstrating their teaching and answering interview questions, the committee

assessed how each applicant could fulfill the job duties if hired. (Doc. 31-3 at 11.)

For the interviews, the committee asked each applicant the same six questions and rated their answers on a scale of 1 through 5. (*See, e.g.,* Doc. 31-2 at 61–67; Doc. 31-15 at 3.)

After the interviews, the top four scored candidates—Jackson Bonner, Joseph Halsey, Wesley Talton, and Jessica Bolt—were forwarded for additional rounds of interviews with Dr. Linda North (Academic Dean) and Brent Catchings (Chair of Social Science Division). Bonner was the highest scoring applicant, Halsey the second highest, Talton the third highest, and Bolt the fourth highest. (*See, e.g.,* Doc. 31-2 at 61.) Culverhouse was the fifth highest scoring applicant, and therefore he did not advance to the second round of interviews.

Of the four remaining applicants, Dr. North and Mr. Catchings recommended Bonner and Talton for a final interview with Southern Union President Todd Shackett. (Doc. 31-16 at 26–27.) Following that final interview, President Shackett selected Bonner for the position.

Although Culverhouse believes there was nothing improper about the job announcement or the search process and procedures, (Doc. 31-1 at 30–31), he believes that he was improperly excluded from the second round of interviews, especially when compared to Halsey, a maintenance worker and occasional adjunct instructor, and Bonner, who had less teaching experience than Culverhouse, (Doc.

26 at 3; Doc. 31-1 at 46).

## ANALYSIS

The Rehabilitation Act prohibits federally funded agencies from discriminating in employment against individuals with disabilities. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Under the Rehabilitation Act, a plaintiff may establish a prima facie case of disability discrimination in two ways: (1) via direct evidence of discriminatory intent, or (2) by meeting the *McDonnell Douglas* burden-shifting framework. *Ctr. v. Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Since Culverhouse offers no direct evidence of discrimination, nor does he claim the existence of any, he must proceed under the *McDonnell Douglas* framework.

Under the *McDonnell Douglas* framework, Culverhouse must first establish a prima facie case of discrimination. *Ctr.*, 895 F.3d at 1303. If a prima facie case is established, the burden shifts to Southern Union to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id*. Then, the ultimate burden of proof shifts back to Culverhouse to show that Southern Union's reason is pretextual. *Id*.

To establish a prima facie case of discrimination under the Rehabilitation Act, Culverhouse must show that: (1) he has a disability, (2) he was otherwise qualified

6

for the position, and (3) he was subjected to unlawful discrimination as the result of his disability. *Id.*

The Court assumes, without deciding, that Culverhouse can establish a prima facie case of discrimination under the Rehabilitation Act,[1] and therefore the burden shifts to Southern Union to articulate a legitimate, nondiscriminatory reason for its employment action—the failure to advance Culverhouse into the final round of four.[2]

On this issue, Southern Union argues that Culverhouse, like eight other candidates who interviewed for the position, did not make the final round of four because he did not score in the top four after his presentation and interview. Culverhouse broadly criticizes the scoring system as entirely subjective and suspect, especially when the committee members could not in their depositions expound further on their scoring of the candidates beyond that reflected on the individual scoring sheets. In casting this broad net, Culverhouse largely meshes two distinct issues: what constitutes a legitimate, nondiscriminatory reason, a low burden that

---

[1] Southern Union has filed an Objection To And Motion to Strike Portions of Culverhouse's Evidentiary Materials (*see* Doc. 36). The Court elects to deny the motion as moot since the Court is pretermitting consideration of Culverhouse's prima facie case where the challenged materials would have relevance.

[2] Southern Union does not raise the issue of whether Culverhouse's mere failure to advance to the round of four is itself actionable, especially when Culverhouse makes no assertion that, in the absence of discrimination, he would have been awarded the position over all individuals who applied.

Southern Union must meet, with Culverhouse's own burden of showing that Southern Union's stated reason is pretext. The Court will begin with whether Culverhouse's fifth-place finish under the scoring system is a sufficient legitimate, nondiscriminatory reason.

Southern Union's interview process employed three criteria: a writing sample, a teaching presentation, and an interview. According to the committee members, emphasis was placed on the teaching presentation over the writing sample and interview. As they all have testified, work and teaching experience were not considered.

The interview itself consisted of six detailed questions that were asked of each applicant:

>1. Tell us why you want to work at SUSCC.
>
>2. SUSCC offers more course sections of Western Civilization than any other History course. Briefly explain the importance and/or relevance of Western Civilization as a subject of study.
>
>3. How would your background & experience strengthen this academic department?
>
>4. Scenario: What would you do if a student asked you for extra credit?
>
>5. A great deal of emphasis (from funding to curriculum focus) in today's academic world is placed on STEM education (Science, Technology, Engineering, & Math). Given that reality, how can & will you work to make history courses relevant to your students?
>
>6. How do you incorporate analysis & evaluation of primary & secondary history sources in order to form a reasoned judgment or conclusion (i.e., critical thinking skills) into your classroom?

Each answer was scored on a scale from 1 to 5 based on different observations by the committee members:

    5 — Outstanding response to question; response relates well to documented experience and realistic expectations; well prepared

    4 — Above average response to question; response demonstrates quick thinking but not as developed as it should be

    3 — Satisfactory response; response articulated clearly; thoughts flow logically

    2 — Weak response to question; response is not clearly articulated; thoughts don't flow

    1 — Response did not answer question clearly or logically

Similarly scored criteria were given as to how each applicant performed in his or her teaching presentation.

Under this scoring system, Bonner scored 285 points overall, Halsey scored 283, Talton scored 276, Bolt scored 275, and Culverhouse scored 265. This system was not, as Culverhouse has characterized it, simply a mathematical calculation void of substance or context. (Doc. 31-2 at 61.) For example, as to the interview scores, Foster concluded that Culverhouse responded to the second question concerning the importance and relevance of Western Civilization as satisfactory, that his response was articulated clearly, and his thoughts flowed logically, which cumulatively fell into a 3 category. (Doc. 31-2 at 62.) As to Bonner on the same question, Foster concluded that Bonner's response was outstanding, that it related well to the

documented experience and was realistic, and that he was well prepared, which cumulatively fell into a 5 category. (Doc. 31-17 at 22.) Compared to Foster, Andrews rated Bonner similarly, (Doc. 31-17 at 23), but rated Culverhouse slightly higher in her assessment, concluding that his response was above average and demonstrated quick thinking, but was not as developed as it could be, which fell into a 4 category, (Doc. 31-2 at 63).

While the interview and presentation process undoubtedly was subjective in nature, the difference in scores was based upon a clear and reasonably specific factual basis from each committee member. The Court concludes that Southern Union's referenced score differential was based upon clear and reasonably specific factual bases and therefore constitutes a sufficient legitimate, nondiscriminatory reason for Culverhouse's failure to advance. This is not the sort of interview scoring process where the interview panel provided nothing other than a list of numerical scores that correlate to nothing substantive. *Cf. Simmons v. Wash. Cnty. Bd. of Educ.*, No.: 19-cv-00743, 2021 WL 2004794, at *9 (S.D. Ala. May 19, 2021) ("Nothing on those scoresheets provides any reasoning or explanation for any of the scores assigned by any committee member to any candidate's answer."). To the contrary, similar content-based interview processes have been found to constitute a sufficient legitimate, nondiscriminatory reason for advancement of certain applicants over others. *See, e.g., Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.,*

256 F.3d 1095, 1105–06 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008); *Gunn v. Elmore Cnty. Bd. of Educ.*, No. 2:16-cv-548, 2018 WL 1514400 (M.D. Ala. Mar. 8, 2018).

As to his pretext burden, Culverhouse must show both (1) that Southern Union's proffered reason was false, and (2) that discrimination was the real reason for Southern Union's action. *Brooks v. Cnty. Comm'n*, 446 F.3d 1160, 1163 (11th Cir. 2006). Culverhouse must present actual evidence to satisfy this burden: "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext . . . ." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1313 (11th Cir. 2016) (quoting *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)). To satisfy this burden, Culverhouse can point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Southern Union's proffered explanation. *Brooks*, 446 F.3d at 1163 (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)). He must rebut Southern Union's proffered reason head on with evidence showing that the real reason for Southern Union's employment decision is discrimination. *See Furcron*, 843 F.3d at 1313–14. Culverhouse must do so by "persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981).

The Court turns to Culverhouse's evidence to determine whether it is sufficient to rebut Southern Union's legitimate, nondiscriminatory reason for its employment decision.

As to pretext, Culverhouse largely argues that the scoring system was entirely subjective, that the interview committee could not explain the distinction between Culverhouse's scores and the scores of the four candidates who did advance, that the committee members were not given any training or guidelines on how to evaluate candidates and had not seen Southern Union's Interviewing Techniques form, and that they took no notes. As he states it, "[i]gnoring Mr. Culverhouse's significant education, lengthy experience as a professor, and outstanding interview, Southern Union's Selection Committee merely entered unjustified and unsubstantiated 'numbers' on a simple form and immediately disqualified Mr. Culverhouse from any further consideration in the hiring process." (Doc. 35 at 29.)

First, as to the scoring system, which Culverhouse describes as entirely subjective and without explanation, the Eleventh Circuit has held that a subjective reason, including interview performance, qualifies as a "legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis on which it based its subjective opinion." *Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000). Thus, Southern Union's proffered reason for not advancing Culverhouse into the top four is considered

sufficient to rebut Culverhouse's prima facie case of discrimination so long as this reason articulates a clear and specific factual basis upon which it was based. As already discussed, it does. The scoring system was clear and reasonably specific. It was not, as Culverhouse describes it, merely a set of numbers on a piece of paper. Therefore, this basis does not serve as sufficient evidence of pretext.

As for training, Culverhouse argues that the committee was not specifically trained to conduct interviews. Well-trained or not, this does not show pretext for discrimination as it concerns the scoring system. While training may be an appropriate consideration in the context of the best individuals to serve on an interview committee for an open history professor position, this does not serve as evidence of pretext. For example, it does not show that they somehow were selected with the goal of discriminating against Culverhouse on the basis of his disability, or that the committee members conducted the interview process with the goal of promoting non-disabled persons over persons with a disability. In short, no discriminatory inference can be drawn from the training, or lack thereof, given to the committee members. If it was a problem, it was a problem that impacted every applicant in a nondiscriminatory manner.

Culverhouse's citation to the committee's failure to use an Interview Techniques form is also without relevance, as that form was not in effect at the time when the interviews were conducted. Additionally, Culverhouse fails to show how

the failure to use such a form, if one existed and should have been used, is an indicium of discrimination or pretext.

The same holds true of the notes issue. The record shows that the committee members were given no specific instructions to either take notes or not to take notes. The record does show, however, that some committee members took notes on certain issues during the interviews. Like with the other evidence, the Court strains to see how this evidence, if it exists, shows pretext, especially in the absence of a Southern Union policy that was violated. *See Bass*, 256 F.3d at 1108 ("An employer's violation of its own normal hiring procedure may be evidence of pretext.").

Culverhouse's disparity assertion also lacks sufficient basis. It is true that disparities in qualifications can constitute evidence of pretext, but "the test is whether the disparities are of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Higgins v. Tyson Foods, Inc.*, 196 F. App'x 781, 783 (11th Cir. 2006); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) (per curiam). But Culverhouse cannot "prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." *Barber v. Cellco P'ship*, 808 F. App'x 929, 936 (11th Cir. 2020) (per curiam) (alteration in original) (quoting *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)); *see also Brooks*, 446 F.3d at 1163

(stating the same in the context of a Title VII failure-to-promote claim).

And the Court must be mindful to not substitute its own judgment as to who should have received the position in the place of Southern Union's own judgment. *See Dudley v. Wal-Mart Stores, Inc.*, 931 F. Supp. 773, 801 (M.D. Ala. 1996) (noting that the court does not "sit as a super-personnel department or determine whether the employer exercised prudent business judgment") (internal quotations omitted)), *abrogated on other grounds by Moore v. State of Ala.*, 989 F. Supp. 1412 (M.D. Ala. 1997). In other words, even if the Court believed that Southern Union should have advanced Culverhouse into one of the top four spots based upon Culverhouse's qualifications, such a belief would be irrelevant as to whether Southern Union's legitimate, nondiscriminatory reason for advancing the other four was pretext unless the Court could conclude that the disparities in qualifications are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Bonner, Talton, Halsey and Bolt] over [Culverhouse] for the job in question." *Cooper v. S. Co.*, 390 F.3d 695, 732 (11th Cir. 2004) (quoting *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000)), *abrogated on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006).

Culverhouse was one of thirteen individuals who were interviewed for the history professor position. He was the fifth best candidate by the process employed by Southern Union. Of the four candidates that advanced, Culverhouse attacks the

qualifications of only two, characterizing Halsey a "maintenance worker" and Bonner a person with less teaching experience.  These assertions, however, conveniently ignore several important key facts. First, Culverhouse ignores the fact that the committee expressly excluded consideration of each applicant's qualifications and prior experience since all the applicants met the minimum qualifications.  And as to Halsey, Culverhouse ignores the fact that Halsey met the minimum qualifications for the position, held two master's degrees—including one in liberal studies with a concentration in history—had completed at least eighteen hours of coursework in history, and had taught as an adjunct professor at Southern Union and another community college.  Halsey was not as Culverhouse suggests some sort of janitor who was totally devoid of qualification for the job of a professor.

The only relevant evidence, other than the result itself, that Culverhouse advances at the pretext stage is a stray remark allegedly made by one of the committee members over twenty years earlier.  That statement is far too attenuated and remote to constitute the type of evidence that would satisfy Culverhouse's burden at this stage.

While Culverhouse disagrees with Southern Union's decision not to hire him or to advance him to the round of four,[3] the Court does "not sit as a super-personnel

---

[3] Culverhouse altogether ignores the next two levels of consideration by different decisionmakers in the hiring process that Culverhouse would have had to survive to get the position.

department that reexamines an entity's business decisions. . . . [N]o matter how mistaken . . . . our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). And, as has been noted many times before, an employer may make an employment decision "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated on other grounds by Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019).

Culverhouse has presented nothing about the interview process that shows that it was suspect or designed to promote non-disabled persons to the next level of interviews over disabled persons. Moreover, unlike that process at issue in *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095 (11th Cir. 2001), where there was an express affirmative action plan in place, Culverhouse has presented no evidence that the interview process was conducted with disability-conscious hiring and promotion goals in mind. In short, Culverhouse fails to present such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Southern Union's proffered legitimate reason for its actions that a reasonable factfinder could find it unworthy of credence. Indeed, Culverhouse's evidence does not persuade the Court that a discriminatory reason more likely motivated Southern Union's hiring

decision. Accordingly, the Court concludes that Culverhouse has not met his burden of persuasion, and therefore, Southern Union's motion for summary judgment is due to be granted.

## CONCLUSION

It is therefore ORDERED as follows:

(1) Defendant Southern Union State Community College's Motion for Summary Judgment (Doc. 31) is GRANTED.

(2) Defendant's Objection To And Motion to Strike Portions of Culverhouse's Evidentiary Materials (Doc. 36) is DENIED as moot.

(3) A separate judgment will issue.

**DONE** and **ORDERED** on this the 13th day of September, 2022.

                                              /s/ R. Austin Huffaker, Jr.
                                              R. AUSTIN HUFFAKER, JR.
                                              UNITED STATES DISTRICT JUDGE